Argued and submitted February 15, OAR 125-055-0005 to 125-055-0045 held valid
July 26, petition for review denied October 31, 2006 (341 Or 579)

INDEPENDENT CONTRACTORS
RESEARCH INSTITUTE,
a non-profit trade association,
and Fair Competition Alliance,
an assumed business name;
N&C Services, Inc.,
an Oregon corporation;
Metropolitan Presort, Inc.,
an Oregon corporation;
Oregon School Employees Association;
BWK, Inc.,
an Oregon corporation,
dba Mid-Valley Presort & Mailing, Inc.;
and Advanced Security, Inc.,
an Oregon corporation,
*Petitioners,*

*and*

SEIU SCHOOL EMPLOYEES LOCAL 140,
*Petitioner Inactive,*

*v.*

DEPARTMENT OF ADMINISTRATIVE SERVICES,
*Respondent.*

A123407

139 P3d 995

James M. Brown argued the cause for petitioners. With him on the briefs were Charles R. Williamson & Kell Alterman & Runstein, LLP.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

SCHUMAN, P. J.

---

* Landau, J., *vice* Ceniceros, S. J.

## SCHUMAN, P. J.

Petitioners challenge the validity of rules promulgated by the Department of Administrative Services (DAS) to implement the Products of Disabled Individuals Act (PDIA), ORS 279.835 to 279.855. In their eight assignments of error, petitioners argue that the fiscal impact statement accompanying the new rules was inadequate and that several of the rules create policies that are not authorized by the PDIA. We hold that the rules are valid.

The key provision of the PDIA requires public agencies to purchase products and services from nonprofit providers, outside of the competitive bidding process that normally governs public contracting, if the provider is a nonprofit agency employing disabled individuals.[1] The purpose of the PDIA is "to encourage and assist disabled individuals to achieve maximum personal independence through useful and productive gainful employment by assuring an expanded and constant market for sheltered workshop and activity center products and services * * *." ORS 279.840. In order to participate in the program, the nonprofit agency must be "operated in the interest of disabled individuals" and not provide benefits to shareholders or others; it must comply with state occupational health and safety standards; and it must "employ[ ] disabled individuals for not less than 75 percent of the work hours of direct labor required for the manufacture or provision of the products or services." ORS 279.835(5)(a) - (c). Such an agency is deemed a "[q]ualified nonprofit agency for disabled individual[s]," *id.*, also known as a "qualified rehabilitation facility" or "QRF."

---

[1] ORS 279.850(1) provides:

"If any public agency intends to procure any product or service on the procurement list [described in ORS 279.845], that public agency shall, in accordance with rules of [DAS], procure such product or service, at the price established by the department, from a qualified nonprofit agency for disabled individuals provided the product or service is of the appropriate specifications and is available within the period required by that public agency."

Although the statutes comprising the PDIA have been amended on several occasions since their inception in 1977, those changes were minor and did not alter the substance of the program. Accordingly, all references to the PDIA are to the present version of those statutes.

For implementation and administration of the PDIA, and in particular for specifying appropriate products, services, prices, and providers, the legislature turned to DAS. ORS 279.845.[2] Once a product or service is listed by DAS as available through a QRF, any public agency seeking to procure that product or service must do so from the listed QRF at the price established by DAS. ORS 279.850(1).

In 1981, DAS promulgated a "temporary" rule to administer the program created by the PDIA. OAR 125-30-015 (1981). That rule, repeatedly readopted but never "permanent," remained in effect until 2003, when DAS promulgated the rules being challenged in this proceeding. The new rules, OAR 125-055-0005 to 125-055-0045, became effective on September 8, 2003.[3] Petitioners, a coalition of businesses and nonprofit trade and employer associations, filed the present petition challenging the rules. ORS 183.400(1).

■ We have authority to invalidate an agency rule only if we find that it "[v]iolates constitutional provisions"; "[e]xceeds the statutory authority of the agency"; or "[w]as adopted without compliance with applicable rulemaking procedures." ORS 183.400(4)(a) - (c); *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984). Petitioner's first assignment of error, contending that DAS

---

[2] ORS 279.845 provides, in part:

"(1) It shall be the duty of the Oregon Department of Administrative Services to:

"(a) Determine the price of all products manufactured and services offered for sale to the various public agencies by any qualified nonprofit agency for disabled individuals. * * *

"(b) To revise such prices from time to time in accordance with changing cost factors; and

"(c) To make such rules regarding specifications, time of delivery and other relevant matters of procedure as shall be necessary to carry out the purposes of [the PDIA].

"(2) The department shall establish and publish a list of sources or potential sources of products produced by any qualified nonprofit agency for disabled individuals and the services provided by any such agency, which the department determines are suitable for procurement by public agencies * * *."

[3] Although the rules have subsequently been amended, the amendments occurred after petitioners' opening brief was filed in November 2004 and, in any event, do not alter the substance of our analysis. Thus, as do petitioners, we base our discussion of the rules on the versions that became effective on September 8, 2003.

filed an inadequate fiscal and economic impact statement, asserts a procedural flaw. The remaining assignments deal with what petitioners argue are rules that exceed the rule-making authority conferred on DAS by the PDIA. We begin with the procedural issue.

With every notice of intended rulemaking, an agency must provide:

> "A statement of fiscal impact identifying state agencies, units of local government and the public which may be economically affected by the adoption, amendment or repeal of the rule and an estimate of that economic impact on state agencies, units of local government and the public. In considering the economic effect of the proposed action on the public, the agency shall utilize available information to project any significant economic effect of that action on businesses which shall include a cost of compliance effect on small businesses affected."

ORS 183.335(2)(b)(E). The fiscal impact statement that DAS published with the notice of rulemaking states:

> "Information is not available that would permit the Department of Administrative Services to quantify, in terms of dollars, the fiscal impact of the adoption of these rules on state agencies, units of local government, and the public. However, the addition of an express rule requirement (now observed in practice) that QRFs submit annual re-applications to participate in the program would increase QRF costs by requiring them [to] submit reapplications—costs that will vary with [the] organization's size and the range of its products and services. Section 4 of the rules (which would substantially continue the application of temporary rule provisions adopted on September 27, 2002 (OAR 125-030-0015(5) (temporary)) would provide more specific standards for determining whether products and services of the disabled are suitable for procurement by public agencies, thus making suitability simpler to apply for and to evaluate, which should afford some savings to the department and QRFs. However, a requirement that QRFs submit a 'written plan' when asking for suitability decisions (carried over from the temporary rule) will add QRF costs that will vary with the nature and scope of the product or service. QRF annual audit costs are not expected to increase, but new authority to require non-compliant QRFs

to submit quarterly audits will increase expenses of the affected QRFs by the cost of those audits.

"State agencies and local governments who purchase products or services of the disabled may experience modestly increased costs of these items because the new rules would expressly permit QRFs to recover the costs of their annual audits through their prices under [ORS] 279.845(1)(a) (section 8(9)). Under [OAR] 125-055-0035, new requirements that residential programs and public benefit corporations must submit documentation of their qualifications to make purchases under the program will increase their expenses by the cost of making those submissions.

"New provisions that establish appeal mechanisms for QRF eligibility, suitability and price determinations, including potential contested cases concerning suitability decisions, may increase the costs to affected private parties and QRFs who are involved in those disputes (and to the department in conducting the proceedings) in a manner that cannot be predicted because the frequency of these proceedings cannot be predicted."

Petitioners argue that DAS's fiscal impact statement falls short of the standard imposed by the legislature in two respects. First, it fails to provide estimates that quantify the extent to which "contracts awarded [under the PDIA] displace contracts for products and services produced or provided by competitive businesses." Second, petitioners argue that, to the extent that DAS's fiscal impact statement does provide estimates, it does so with neither sufficient precision nor a sufficient excuse for that imprecision. We do not find petitioners' arguments to be persuasive.

■ In arguing that the rules fail to estimate the amount of money taken away from competitive, non-QRF providers, petitioners appear to misunderstand what ORS 183.335(2)(b)(E) requires:

"A statement of fiscal impact identifying state agencies, units of local government and the public which may be economically affected by the adoption, amendment or repeal of the rule and an estimate of that economic impact on state agencies, units of local government and the public."

The agency, in other words, must estimate the economic impact on various entities of the "adoption, amendment or repeal of *the rule*," not the adoption of the PDIA. ORS 183.335(2)(b)(E) (emphasis added); *see also Dika v. Dept. of Ins. and Finance*, 312 Or 106, 110, 817 P2d 287 (1991) (fiscal impact statement must provide estimate of economic impact "if the rule is adopted"). By demanding that DAS provide an estimate of the value of contracts that will not be awarded to "competitive businesses," petitioners confuse the impact of the PDIA with the impact of the administrative overlay to that legislation, that is, the rules that implement it. It was the legislature's policy choice, not DAS's, to direct certain state expenditures to QRFs instead of to other providers; DAS's rules simply implement that choice with procedures and definitions. To the extent that the rules, as distinct from the PDIA, have an economic impact, that impact is the added administrative cost of following the procedures that the rules impose.

■       The second part of petitioners' attack on the fiscal impact statement—that, insofar as the statement does provide estimates, they lack precision and do not provide an adequate reason for that lack—is unpersuasive as well, in light of the cases construing the statutory requirement. In *Dika*, the Supreme Court deemed inadequate a fiscal impact statement that merely identified the entities that would be economically affected by the proposed rules but failed to explain the impact that the rules would have on those entities. The court explained, "The statement does not attempt to [quantify the economic impact], nor does it provide any explanation for failing to do so, such as those that might be related to inadequacy of 'available information' or that would be appropriate where there will be no fiscal impact." *Id.*

In reliance on *Dika*, the petitioner in *Troutlodge, Inc. v. Dept. of Fish & Wildlife*, 113 Or App 123, 126, 830 P2d 622, *rev den*, 314 Or 392 (1992), challenged an economic impact statement on the basis that "it did not include an estimated cost of compliance to businesses." The relevant part of the statement provided:

" 'The public is affected by the adoption of these rules: These rules can be viewed as restricting the ability of fish

propagation license holders to produce fish; however, the rules are needed to ensure that fish propagation operations are conducted in a manner consistent with Oregon law. Some fish propagation license holders may incur additional costs to comply with some of the provisions of the rules. *The potential magnitude of these additional costs can't be quantified at this time.*' (Emphasis supplied.)"

*Id.* We rejected the petitioner's challenge, distinguishing the respondent's fiscal impact statement from the one in *Dika* by invoking the purpose underlying the statutory requirement:

"Petitioner's reliance on *Dika* is misplaced. Here, the notice points out that license holders may incur additional costs to comply with some of the rules but '[t]he potential magnitude of these additional costs can't be quantified at this time.' The purpose of ORS 183.335(2)(b)(D) is to provide protection against arbitrary and inadequately informed governmental conduct. The purpose of the statute has been met, because the notice informs license holders of a potential financial impact, the extent of which is unknown."

*Id.* at 126-27 (citations omitted); *accord Oregon Funeral Directors v. Mortuary and Cemetery Bd.*, 132 Or App 318, 323, 888 P2d 104 (1995) ("If the statement, when considered with the other information, is sufficient to notify persons who might be economically affected to evaluate their positions, then the purpose of providing protection against arbitrary and inadequately publicized governmental conduct has been met."). We also noted, "ORS 183.335(2)(b)(D) provides that the 'agency shall utilize *available* information' to project the fiscal impact on businesses. There is nothing in the statute that requires an agency to utilize information that is not available." *Troutlodge, Inc.*, 113 Or App at 127 (emphasis in original).

Most recently, in *The Building Department, LLC v. DCBS*, 180 Or App 486, 490-91, 43 P3d 1167 (2002), we invalidated rules because of inadequate fiscal impact statements that precisely identified the economic consequences to government entities of proposed rules, but, with respect to other entities, stated only, "An economic impact may be realized by the public and industry; however, whether there is an

increase or a decrease is undetermined at this time." We explained that the statements fell short for two reasons:

"Nothing in either the challenged fiscal impact statements or the notices of proposed rulemaking issued by respondent suffices to explain why the effect is undetermined or, more importantly, to allow potentially affected parties to evaluate their positions and understand what information, if any, respondent might need 'in order to make an informed decision.' *Troutlodge, Inc.*, 113 Or App at 127."

*The Building Department, LLC*, 180 Or App at 493.

■ The analysis of ORS 183.335(2)(b)(E) in *Dika* and subsequent cases reduces to two requirements: First, the statement must identify which entities are to be affected by enactment of the rules. Second, it must give the affected entities enough information to evaluate their position so that they might participate meaningfully in the rule adoption process or, if that information is not available, it must so state.

Petitioners do not contend that the statement fails adequately to identify affected entities. We conclude, in addition, that DAS's statement satisfies the second requirement as well. It does so by explaining that the eventual result to each of the identified entities will likely be an increase in cost and by articulating the reasons for those costs. In doing so, DAS's fiscal and economic impact statement "provides a reasonable opportunity for interested persons to be notified of the agency's proposed action[.]" ORS 183.335(1)(a). Although DAS does not attach a dollar figure to each projected economic impact, it does properly explain that its failure to provide that degree of detail results from the unavailability of information. *See Troutlodge, Inc.*, 113 Or App at 126-27. We therefore reject petitioners' challenge to the fiscal impact statement.

■ Petitioners' remaining eight assignments of error focus on particular rules and contend that, in promulgating them, DAS exceeded the rulemaking authority conferred on it by the PDIA. That act does not use open-ended terms such as "fair" or "undue" that would indicate a delegation of basic policy decisions to DAS. Further, the statutory delegation to DAS to "make such rules * * * as shall be necessary to carry

out the purposes of [the PDIA]," ORS 279.845(1)(c), does not confer on the agency any independent authority to complete a legislative policy decision; that decision inheres in ORS 279.840 (policy of PDIA is "to encourage and assist disabled individuals to achieve maximum personal independence through useful and productive gainful employment by assuring an expanded and constant market for sheltered workshop and activity center products and services"). We therefore review the rules to determine whether they are "within the legislative policy which inheres in" the statute itself, *Springfield Education Assn. v. School Dist.*, 290 Or 217, 227, 621 P2d 547 (1980), that is, whether they are "an interpretation" of the legislature's policy rather than an execution of a legislative assignment to make new policy, *Megdal v. Board of Dental Examiners*, 288 Or 293, 305, 605 P2d 273 (1980). Put another way:

> "Our task in a rule challenge pursuant to ORS 183.400 is to determine whether 'the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute.' "

*WaterWatch v. Water Resources Commission*, 199 Or App 598, 605, 112 P3d 443 (2005) (quoting *Planned Parenthood Assn.*, 297 Or at 565).

Petitioners' second and third assignments of error assert that DAS's definitions of "disabled individual" and "competitive employment" exceed the statutory mandate contained in ORS 279.835(3). That statute provides:

> " 'Disabled individual' means an individual who, because of the nature of disabilities, is not able to participate fully in competitive employment, and for whom specialized employment opportunities must be provided."

The challenged definition of "Disabled Individual" provides:

> " 'Disabled Individual,' as defined in ORS 279.835(3), means a person who has a physical or mental impairment (a residual, limiting condition resulting from an injury, disease or congenital defect) that so limits the person's functional capabilities (such as mobility, communication, self-care, self-direction, work tolerance or work skills) that the

individual is not able to engage in normal competitive employment over an extended period of time and, as a result, must rely on the provision of specialized employment opportunities by qualified nonprofit agencies for disabled individuals."

*Former* OAR 125-055-0005(1)(d) (2004), *renumbered as* OAR 125-055-0005(4) (2005). The definition of "Competitive Employment," in turn, provides:

" 'Competitive Employment' means work performed by an individual in the competitive labor market on a full-time basis with no more than reasonable accommodation (as required by the Americans with Disabilities Act, 42 USC §§ 12101 to 12213) for which the individual is compensated within the range of customary wages and levels of benefits paid in the community for the same or similar work performed by individuals who are not disabled."

*Former* OAR 125-055-0005(1)(c) (2004), *renumbered as* OAR 125-055-0005(3) (2005).

■      Petitioners contend that the universe of individuals captured by the definition of "disabled individual" in *former* OAR 125-055-0005(1)(d) is larger than the universe of individuals captured by ORS 279.835(3) because the rule would include individuals with merely "transitory conditions" who are not "severely" disabled. However, petitioners fail to note that the rule includes only individuals whose disability extends "over an extended period of time." *Former* OAR 125-055-0005(1)(d). They also fail adequately to explain why a rule that applies the PDIA to "disabled individuals" is inadequate because it does not apply only to "severely" disabled individuals when the PDIA itself does not use the term "severely." Nothing in the statute or (contrary to petitioners' rather convoluted argument) its legislative history supports such a contention.

■      Petitioners also charge that DAS's definition of "competitive employment," read in conjunction with the definition of "disabled individual," creates a program that, contrary to legislative intention, would "open[ ] the door for QRFs to hire as 'disabled individuals' tens of thousands of slightly impaired Oregonians who are able to find work in the labor market at or above minimum wage but less than 'customary

wages and levels of benefits' for that particular job," as well as individuals "who are able to find work on the open market for three-quarter time or even 90% of full-time at prevailing wages but who are unable to work 'full-time.' " (Underscoring in original.) These arguments, however, take issue with the policy objective of the statute itself and not with DAS's implementation of that objective by rule. To successfully challenge the rules, in other words, petitioners would have to explain why the statutory phrase "participate fully" in employment does not mean participate in employment "on a full-time basis," and why the statutory term "competitive employment" does not mean employment that pays at a level that is customary in the community for nondisabled individuals. They provide no such explanation, and we can conceive of none.

Petitioners assert in their fourth assignment of error that DAS exceeded its statutory authority by adopting a rule that allows an entity to qualify as a QRF with respect to its products or services that are produced or provided by a workforce consisting of fewer than 75 percent disabled individuals. The relevant statutory provision states that a QRF is a nonprofit organization

"[t]hat in the manufacture of products and in the provision of services, whether or not the products or services are procured under ORS 279.835 to 279.855, during the fiscal year employs disabled individuals for not less than 75 percent of the work hours of direct labor required for the manufacture or provision of the products or services."

ORS 279.835(5)(c). In response to that statutory requirement, DAS promulgated *former* OAR 125-055-0015(3)(d)(A) (2004), *renumbered as* OAR 125-055-0015(3)(d)(B) (2005), which provides, in part:

"[A]n applicant is required, during the applicant's fiscal year, to employ Disabled Individuals for not less than 75 percent of the total work hours of direct labor required for the manufacture or provision of the products or services produced by the applicant. *The 75 percent direct labor requirement need not be met with respect to each product or service provided by the applicant, or with respect to each contract the applicant enters into under this program.*"

(Emphasis added.) Petitioners object to the italicized sentence. They interpret the PDIA as imposing a product-by-product or service-by-service requirement of 75 percent disabled participation; the effect of the statute, they contend, is to exempt from the competitive bidding process only particular products or services that derive from a workforce consisting of 75 percent disabled persons. DAS, on the other hand, interprets the relevant provision of the PDIA as imposing an entity-by-entity requirement that 75 percent of the entity's workforce consist of disabled individuals; any such entity that meets this and the other requirements qualifies as a QRF, and its suitable products and services, even those that are made or provided by a workforce of less than 75 percent disabled individuals, can qualify for inclusion on a "procurement list," ORS 279.845(2), and must be purchased by agencies outside of the competitive bidding process if they meet all of the other criteria.

Petitioners' theory cannot withstand scrutiny. The text of ORS 279.835(5)(c) does not imply that only products or services deriving from a 75 percent disabled workforce can qualify for inclusion on the procurement list. The statutory criteria address providers, not products or services. An entity either qualifies as a QRF or it does not; the statutes do not provide for a partial qualification, that is, qualification with respect to some products and services and not others. Indeed, the explicit policy statement declares that the purpose of the PDIA is

> "to encourage and assist disabled individuals to achieve maximum personal independence through useful and productive gainful employment by assuring an expanded and constant market for *sheltered workshop and activity center products and services*, thereby enhancing their dignity and capacity for self-support and minimizing their dependence on welfare and need for costly institutionalization."

ORS 279.840 (emphasis added). The emphasized phrase, which can be paraphrased, "products and services from sheltered workshops," demonstrates that the legislature chose to expand the opportunities for disabled individuals by privileging employers who hire them. Although the legislature could have chosen to expand the opportunities for disabled individuals by privileging particular products or services produced

or provided by them, it did not do so. Thus, *former* OAR 125-055-0015(3)(d)(A) correctly applies the legislative policy embodied in ORS 279.835(5)(c) in particular and the PDIA in general.

■       Petitioners' fifth assignment of error challenges OAR 125-055-0010(4) to the extent that it provides that the advisory council established by that rule is not subject to the public meetings law, ORS 192.610 to 192.710. The disputed rule provides:

> "In promoting the policy of this section and ORS 279.850(2), the Chief Procurement Officer may appoint uncompensated volunteer members to serve on an advisory council for purchases from qualified rehabilitation facilities to review available information on QRF programs and to make recommendations to the Chief Procurement Officer concerning the facilitation and administration of the program under ORS 279.835 to 279.850. The Chief Procurement Officer's authority to appoint advisory council members includes the authority to remove and replace members in the Chief Procurement Officer's sole discretion. Meetings of the advisory council for purchases from qualified rehabilitation facilities are not subject to the public meetings law (ORS 192.610 to 192.710). However, to facilitate attendance by members of the public, the State Procurement Office will post, at least two business days prior to each meeting, notice of the times and places of meetings of the advisory council on a web-site maintained by the State Procurement Office. However, the State Procurement Office reserves the right to change the meeting time and place after the posting of notice of a meeting to address scheduling needs or for the convenience of participants."

The advisory council created by DAS, then, advises the Chief Procurement Officer on issues "concerning the facilitation and administration of the program." DAS contends that, because the advisory council provides recommendations to a single official, it is exempt from the requirements of the public meetings law. We agree.

The public meetings law requires that "[a]ll meetings of the *governing body of a public body* shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by ORS 192.610 to

192.690." ORS 192.630(1) (emphasis added). That law defines "governing body" as "the members of any public body which consists of two or more members, with the authority to make decisions for or recommendations to a public body on policy or administration." ORS 192.610(3). A "public body," in turn, is "the state, any regional council, county, city or district, or any municipal or public corporation, or any board, department, commission, council, bureau, committee or subcommittee or advisory group or any other agency thereof." ORS 192.610(4).

Thus, in order to be subject to the public meetings law, an entity must (1) make decisions for or recommendations to (2) the state, county, city, agency, board, etc. The advisory council meets only the first criterion. It makes recommendations, but it does not make them to one of the groups named in ORS 192.610(3). Rather, it makes them to an individual: the Chief Procurement Officer. An individual, even one who is an officer of a named group, is not a "public body." As the Attorney General has persuasively reasoned:

> "In defining the term 'public body' as it is used in the Public Meetings Law, ORS 192.610(4) lists various types of governmental entities. We deem it significant that it defines the term to encompass public officers only as members of such entities, and not individually. The omission stands out sharply when ORS 192.610(4) is contrasted with ORS 192.410(1), the homologous section of the Public Records Act. ORS 192.410(1) in part provides: ' "Public body" includes every state *officer*, agency, department, division, bureau, board and commission . . . .' (Emphasis added.) We conclude that an individual public officer is not a 'public body' as that term is used in the Public Meetings Law."

42 Op Atty Gen 187, 189 (1981) (footnote omitted). The quoted passage contains a footnote stating, in part:

> "We regret the necessity to reach this conclusion, because the public policy behind the Public Meetings Law applies with equal force to a committee making recommendations to a public officer as it does to such a committee making recommendations to a collective body. The legislature should consider amendment of ORS 192.610(4) to include the term 'officer.' "

*Id.* at 189 n 1. Like the Attorney General in 1981, we believe that redefining "public body" as that term is used in the public meetings law to include a single individual is a task for the legislature and not for this court. We therefore conclude that, in providing that meetings of the advisory council were not subject to the public meetings law, DAS did not err, because the council provides recommendations to an individual—the Chief Procurement Officer—and not to a "public body."[4]

We reject petitioners' sixth assignment of error—that DAS exceeded its statutory authority by promulgating a rule that limits the procurement list to products or services to which disabled individuals have contributed in a "substantial, economically meaningful manner"—without discussion. OAR 125-055-0020(3)(e)(A)(ii).

▬ Petitioners next assign error to DAS's rules for determining the price of products and services produced by QRFs. Petitioners contend that DAS exceeded its statutory authority by adopting a rule that allows the State Procurement Office, when setting the prices for goods and services on the procurement list, to consider factors not specifically included in the statute such as the prices paid by businesses for similar products. The relevant statutory provision is ORS 279.845(1)(a), which provides, in part:

> "The price shall recover for the workshops the cost of raw materials, labor, overhead, delivery costs and a margin held in reserve for inventory and equipment replacement."

The disputed part of the challenged rule, OAR 125-055-0030(5)(a) to (d), provides:

> "(5)  In determining a reasonable and adequate Price of a product or service, the State Procurement Office may consider:

---

[4] Petitioners argue that the Supreme Court's opinion in *Marks v. McKenzie High School Fact-Finding Team*, 319 Or 451, 463-64, 878 P2d 417 (1994), in which the court explores the classification of an entity as a "public body" in the context of the public records law, supports their contention that the advisory council is a "public body." However, the court in *Marks* was examining the definition of "public body" as found in the public records law, and, as the Attorney General opinion notes, that law specifically defines "public body" to include an individual officer.

"(a)   Prices of similar products or services purchased in comparable quantities by federal agencies under the authorized federal program (Javits-Wagner-O'Day Act);

"(b)   Prices of products or services of similar specifications and quantities previously purchased by government agencies from responsible contractors engaged in the business of selling similar products or services;

"(c)   Prices that private businesses pay for similar products or services in similar quantities of comparable scope and specifications if purchasing from a reputable vendor engaged in the business of selling similar products or services;

"(d)   Prices of products or services of similar specifications and quantities purchased by Agencies from QRFs under the program created by ORS 279.835 to 279.850."

According to petitioners, this rule will allow for prices that are "higher than required to meet the statutory criteria" and "such prices would impose unnecessary expense on state and local government."

Because, in a challenge to the rule's validity, we do not adjudicate particular hypothetical applications, we decline to comment on the situations contemplated by petitioners. *WaterWatch*, 199 Or App at 605. On its face, the rule does not conflict with the statute. The statute specifies only a list of costs that the QRF *must* recover through the determined price; that list, however, does not purport to be exhaustive of all considerations to be included in a determination of price by the agency. Further, even if we were to read the statute as exhaustive, it includes one component, "a margin held in reserve for inventory and equipment replacement," which gives DAS discretion, and DAS would certainly be acting within its authority to consider the disputed factors in determining how to exercise that discretion. Subsection (5), in short, simply specifies considerations that ensure that the determined prices are not excessive or disproportionate to similar products and services. In so doing, it does not exceed DAS's statutory authority. Accordingly, we reject petitioners' seventh assignment of error.

Finally, petitioners' eighth assignment of error challenges DAS's definition of "direct labor" on the ground that it

excludes "services provided by a QRF to Disabled Individuals served by the QRF, such as job training and therapeutic services." OAR 125-055-0035(4)(a). DAS explains that

> "[t]hese 'client-type services' are not required for the production of the products and services [that] the QRF markets to the public, and therefore, the exclusion of such services from consideration as 'direct labor' is authorized, if not required, by ORS 279.835(2) (defining 'direct labor'), ORS 279.835(5)(c) (establishing the 75 percent direct labor requirement), and ORS 279.840 (stating the policy and purpose of the Products of Disabled Individuals program)."

We agree.

Petitioners, in sum, do not make any meritorious challenges to DAS's rules.

OAR 125-055-0005 to 125-055-0045 held valid.