Argued and submitted November 12, 2008, affirmed September 30, 2009,
petition for review denied February 18, 2010 (347 Or 718)

**BWK, INC.,**
*Petitioner,*

*v.*

**DEPARTMENT OF ADMINISTRATIVE SERVICES**
and Garten Services, Inc.,
*Respondents.*

Agency No. 0103;
A131329

218 P3d 156

James M. Brown argued the cause and filed the briefs for petitioner.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent Department of Administrative Services. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Michael C. Livingston, Senior Assistant Attorney General.

John E. Pollino argued the cause for respondent Garten Services, Inc. With him on the brief was Garrett Hemann Robertson P.C.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Petitioner seeks review of a final order issued by the Department of Administrative Services (DAS) after a contested case proceeding determining that respondent Garten Services, Inc. (Garten) was a qualified rehabilitation facility (QRF) under the Products of Disabled Individuals Act (PDIA), ORS 279.835 to 279.855.[1] Petitioner contends that DAS had no authority to conduct a contested case hearing to determine Garten's qualifications as a QRF and that its determinations were not supported by substantial evidence. After review of the agency's relevant legal interpretations for legal error and factual findings for supportive substantial evidence, ORS 183.482(8)(a) and (c), we affirm.

We summarize the background facts, drawing primarily on the findings set out in the order under review. Petitioner is a private corporation in the business of providing mail presorting and other mail-related services to customers. The objective of presorting mail is to qualify for postage discounts by processing mail before it is delivered to the post office. Mail is sorted by zip code, and sometimes by the sequence of a delivery route, making the post office operations more efficient and allowing a postage discount.

Garten is a nonprofit corporation whose mission is "to support people with disabilities in their effort to contribute to the community through employment, career and retirement opportunities." Garten provides mail presorting and other services to private and public customers. For some time, Garten has provided mail presorting services to state agencies and others as a QRF under the PDIA. As set forth below, that qualification requires public agencies to purchase products and services from a QRF, without procurement through the normal competitive selection process. ORS 279.850(1).

In 2001, petitioner filed an action in Marion County Circuit Court to challenge DAS's renewal of its previous QRF contract with Garten for mail presorting services. During the pendency of that case, DAS informed Garten that, if it wished

---

[1] All references to the PDIA, ORS 279.835 to 279.855, are to the versions of those statutes in effect in 2003.

to continue providing mail presorting services to the state, it should request a determination of QRF suitability from DAS. Garten made that request. On March 13, 2003, DAS issued a notice of proposed action to determine whether Garten was suitable as a QRF to provide mail and barcode presorting services. The notice was later amended and reissued. The amended notice of proposed action was directed

"TO: GARTEN SERVICES, INC., AND ALL OTHER PERSONS WHO MAY BE AGGRIEVED OR ADVERSELY AFFECTED BY THIS PROPOSED DETERMINATION."

(Capitalization in original.) The notice set out proposed factual findings and legal conclusions supporting the agency's proposed determination of Garten's suitability as a QRF for mail sorting services. It advised recipients that "[y]ou are entitled to a contested case hearing as provided by the Administrative Procedures Act (ORS chapter 183.413 through 183.470)" and that, should a hearing not be requested, DAS "may issue a final order by default determining the rights of the affected parties." In response to the initial notice, petitioner demanded a contested case hearing and also reserved "all claims including, but not limited to, unlawfulness and absence of statutory authority" for the proceeding. Garten did not request a contested case hearing.

In the Marion County action, DAS moved to dismiss petitioner's earlier action challenging the contract renewal. The court entered an order of abatement on the record, pending the resolution of any contested case proceedings.

On August 21, 2003, petitioner filed a motion in the contested case proceeding to dismiss the amended notice for lack of statutory authority. The administrative law judge (ALJ) denied the motion, and the matter proceeded to a contested case hearing. The ALJ issued a proposed order that was modified and adopted by DAS. The agency's final order concluded that Garten was suitable as a QRF for the provision of mail sorting services. Petitioner seeks judicial review of that final order.

On review, petitioner makes four assignments of error. Petitioner contends that DAS erred in (1) concluding

that it had legal authority to conduct a contested case hearing; (2) deciding that the mail and presorting services provided by Garten were "suitable" for procurement under the PDIA; (3) determining that DAS had performed its duty to set the prices for those services; and (4) finding that Garten employed disabled individuals for not less than 75 percent of the work hours of direct labor required for the provision of services, as required by ORS 279.835(5)(c). In response, DAS and Garten (collectively "respondents") argue that DAS acted according to its statutory authority and that there is substantial evidence in the record to support the agency's findings. We agree with respondents.

■ Petitioner's first assignment of error raises an initial question that we determine before considering the substantive issues on review. Petitioner contends that DAS lacked authority to hold a contested case hearing in this matter. In the proceeding below and on review, petitioner has argued that DAS had no statute or rule allowing contested case proceedings for the determination of QRF suitability and that the contested case proceedings were unlawful because they were arbitrarily offered only to evade circuit court review of the contract extension. DAS responds that it is empowered under ORS 279.845(2) to determine QRF status and suitability and that ORS 183.310(2)(a)(D) authorized it to conduct a contested case hearing to make those determinations.

The Oregon Administrative Procedures Act (APA), ORS 183.310 to 183.750, defines a contested case by the potential consequences of an agency action or the manner by which that action is required to be taken. ORS 183.310(2)(a)(D) provides:

" 'Contested case' means a proceeding before an agency:

"* * * * *

"(D) Where the agency by rule or order provides for hearings substantially of the character required by ORS 183.415, 183.417, 183.425, 183.450, 183.460 and 183.470."

ORS 183.310(6)(a), in turn, defines "order" to mean

"any agency action expressed orally or in writing directed to a named person or named persons, other than employees, officers or members of an agency. 'Order' includes any

agency determination or decision issued in connection with a contested case proceeding."

We understand the crux of petitioner's argument to be that DAS cannot provide for contested case proceedings for a matter merely by proposing to do so. We decided an analogous issue in *Strombeck v. Secretary of State*, 128 Or App 142, 874 P2d 1366, *rev den*, 319 Or 572 (1994). In that case, the Secretary of State determined that a state employee owed the state reimbursement for the use of state property *Id*. at 144. The employee was served with a notice from the secretary advising that the employee was entitled to a contested case hearing on the determination. *Id*. The employee claimed that the secretary lacked authority to conduct a contested case hearing "because there is no statute or constitutional provision requiring a hearing on this type of matter." *Id*. at 145. We disagreed:

"[A]s the state points out, ORS 183.310(2)(a)(D) provides that a contested case includes a proceeding when an agency provides by rule or order for a hearing 'substantially of the character' required by the APA. Here, the Secretary of State did provide by order for a contested case type hearing and, therefore, under ORS 183.310(2)(a)(D), he had authority to conduct the hearing.

"Petitioner next argues that, even if the Secretary of State does have general authority to conduct contested case hearings, that is not the proper procedure to collect funds due to the State of Oregon; rather, the agency must collect the funds through judicial proceedings. * * * [T]he ability to investigate and determine the amount due to the state is clearly within the Secretary of State's authority. ORS 293.260(1), for example, provides:

" 'Except as otherwise specifically provided by law, the Secretary of State shall require all persons who have received any moneys or property belonging to the state and who have not accounted therefor to settle their accounts and to return the moneys or property to the state.'

"The Secretary of State has the authority to conduct a contested case hearing to determine the amount, if any, that a person owes the state."

*Id.* Thus, the notice of proposed action was sufficient to constitute an "order" for purposes of ORS 183.310(2)(a)(D). The selection of a contested case proceeding through that order under ORS 183.310(2)(a)(D) was proper so long as the agency had authority to take the underlying intended action.

The same result obtains here. ORS 279.845, then and now, authorizes DAS to determine the prices of products offered by a QRF and to establish and publish a list of sources of products produced by a QRF "which the department determines are suitable for procurement by public agencies." Therefore, DAS was authorized to make the suitability and pricing determinations with respect to Garten. That being the case, the agency can choose to make those determinations through a contested case proceeding as allowed by ORS 183.310(2)(a)(D).

■ As held in *Oregon Env. Council v. Oregon State Bd. of Ed.*, 307 Or 30, 40, 761 P2d 1322 (1988),

> "[a]n agency may oblige itself to contested case hearings if it identifies certain persons as parties separate from the general public, if it provides for a record of testimony and evidence from the parties that is subject to rebuttal and cross-examination, and if it binds itself to make a decision on the basis of evidence in the record. *See* ORS 183.415 to .470."

Under ORS 183.310(2)(a)(D), if an agency, by rule or order directed to named persons, provides for a hearing with the required contested case procedures, and the agency is otherwise authorized to act in that area of regulation, that proceeding becomes a contested case hearing, and the agency must abide by the applicable hearing procedures.

The amended notice of proposed determination of suitability in this case was issued to "Garten Services, Inc., and all other persons who may be aggrieved or adversely affected by this proposed determination." It stated that each of those persons "[is] entitled to a contested case hearing as provided by the Administrative Procedures Act (ORS chapter 183.413 through 183.470)." The notice qualified as an "order" under ORS 183.310(6)(a) because it was directed to a "named person," *i.e.*, the notice denominated Garten as a recipient. Because the order provided for a hearing under ORS 183.413

through 183.470, the proceeding became a "contested case" under ORS 183.310(2)(a)(D).

 Petitioner argues for the first time on review that the notice, while directed to Garten, was nonetheless not an order within the meaning of ORS 183.310(2)(a)(D) because it was also directed to persons who were not "named persons," *i.e.*, "all other persons who may be aggrieved or adversely affected by this proposed determination." This court will generally not consider an issue on appeal "unless the claim of error was preserved in the lower court[.]" ORAP 5.45(1); *see Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991) (an issue must generally be preserved if it is to be considered on appeal). "The rules of preservation apply on judicial review of administrative agency orders." *Baker v. DMV*, 201 Or App 310, 313, 118 P3d 852 (2005). The alleged error was not preserved under ORAP 5.45. Had it been brought to the agency's attention, DAS may have been able to correct or remedy any procedural deficiency. Thus, we confine our discussion to the merits of petitioner's argument as it was presented below and is reiterated on review, and conclude that, because DAS had authority to permit a contested case hearing in this proceeding, and did so by order, it did not err in failing to grant petitioner's motion to dismiss.[2]

 Petitioner's remaining assignments of error concern application of the Products of Disabled Individuals Act. The purpose of the PDIA is to "further the policy of this state to encourage and assist disabled individuals to achieve maximum personal independence through useful and productive gainful employment by assuring an expanded and constant market for sheltered workshop and activity center products and services * * *." ORS 279.840. The key provision of the PDIA requires public agencies to purchase products and services from certain nonprofit providers, outside of the competitive selection process that normally governs public contracting.[3] To qualify for this preference and exemption from

[2] Because petitioner does not adequately develop the argument that the selection of a contested case process for a new QRF qualification for Garten was unlawful because the agency wanted to preempt the pending court proceedings that concerned a previous qualification, we reject it without further discussion.

[3] ORS 279.850(1) provided:

"If any public agency intends to procure any product or service on the procurement list, that agency shall, in accordance with rules of [DAS], procure

competitive bidding, ORS 279.835(5)(a) to (c) required that the nonprofit entity be "operated in the interest of disabled individuals" and not provide benefits to shareholders or others; it must comply with occupational health and safety standards; and it must "during the fiscal year employ[ ] disabled individuals for not less than 75 percent of the work hours of direct labor required for the manufacture or provision of the products or services." If the nonprofit entity met all of those requirements, it was deemed a "[q]ualified nonprofit agency for disabled individual[s]," also known as a qualified rehabilitation facility or QRF.

The legislature charged DAS with the implementation and administration of the PDIA. ORS 279.845. As noted earlier, DAS must "[d]etermine the price of all products manufactured and services offered for sale to the various public agencies by any qualified nonprofit agency," "make such rules regarding specifications, time of delivery and other relevant matters of procedure as shall be necessary to carry out the purposes of [the PDIA]," and "establish and publish a list of sources or potential sources of products produced by any qualified nonprofit agency * * *, which the department determines are suitable for procurement by public agencies[.]" *Id.*

In 1981, DAS promulgated a "temporary" rule to administer the program created by the PDIA. OAR 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 (Aug 1, 1981). That temporary rule, repeatedly readopted, remained in effect until September 8, 2003, when DAS promulgated the rules now codified at OAR 125-055-0005 to 125-055-0045. *See Independent Contractors Research Institute v. DAS*, 207 Or App 78, 82, 139 P3d 995, *rev den*, 341 Or 579 (2006). The earlier rule was in effect when Garten applied to DAS for QRF status.[4] Thus, our review is conducted under the earlier rule, not the subsequently adopted and differently numbered rules.

---

such product or service, at the price established by the department, from a qualified nonprofit agency for disabled individuals provided the product or service is of the appropriate specifications and is available within the period required by that public agency."

[4] All references to OAR 125-030-0015 refer to the version of the rule that was effective from September 27, 2002 through March 25, 2003, unless otherwise noted.

With that context in mind, we address petitioner's remaining assignments of error. First, petitioner contends that DAS erred in concluding that the services provided by Garten were "suitable for procurement" under the PDIA. ORS 279.845(2) provided:

"The department shall establish and publish a list of sources or potential sources of products produced by any qualified nonprofit agency for disabled individuals and the services provided by any such agency, which the department determines are suitable for procurement by public agencies pursuant to ORS 279.015 and 279.835 to 279.855. This procurement list and revisions thereof shall be distributed to all public purchasing officers."

As noted, DAS adopted rules to implement ORS 279.845(2) and provide guidance on the meaning of "suitable for procurement." Under the terms of OAR 125-030-0015(5), to be "suitable," the following criteria must be satisfied:

"(a) Qualified Rehabilitation Facility (QRF). The QRF proposing to furnish the product or service item must be a qualified nonprofit agency for persons with disabilities as defined in ORS 279.835.

"(b) Contract Authority. The Division and other Agencies must contract directly with the QRF for the contract to qualify for the exception, in ORS 279.015(1)(b), to competitive bidding requirements.

"(c) Ownership. The QRF must own the product or directly provide the service that the QRF proposes to provide to Oregon public agencies through the Division.

"(d) A QRF's contract to provide a service cannot obligate an Agency to buy a product tied to that service unless the product is incidental to, or consumed in, the performance of the service.

"(e) Purpose, Value, Capability. The QRF desiring to furnish the product or service must demonstrate to the Division that the QRF meets the purpose of the Products of Disabled Individuals Law and DAS quality standards and delivery schedules. The QRF must demonstrate capability by submitting to the Division a written plan that addresses:

"(A) Purpose of the Law. The purpose of the law is to further the policy of this state to encourage and assist disabled individuals to achieve maximum personal independence through useful and productive gainful employment by assuring an expanded and constant market for sheltered workshop and activity center products and services, thereby enhancing their dignity and capacity for self support and minimizing their dependence on welfare and need for costly institutionalization. To ensure that a QRF achieves this goal, the QRF must demonstrate:

"(i) The extent of the labor operations to be performed; and

"(ii) That appreciable value will be added to the product or service by persons with disabilities; the term 'appreciable value' means a measurable value added to the final product or service."

The bulk of the mail presorting services proposed to be done by Garten is mechanized. Garten planned to use a multiline optical character recognition (MLOCR) machine to read addresses on regular-sized envelopes and to sort the envelopes. Garten employees would hand-sort "flats," which are mail packaged in manila envelopes or larger envelopes.

Petitioner argues that DAS erred in determining that "appreciable value" would be added to the mechanized sorting by persons with disabilities under OAR 125-030-0015(5)(e)(A)(ii). More specifically, petitioner contends that

"[DAS] did not properly determine that a service provided by mechanized mail sorting equipment was suitable for mandatory public agency procurement because the fundamental and dominant value of such service is provided by the equipment which does not provide employment opportunities for disabled individuals as the statute intended."

Although petitioner refers to the ORS 279.845(2) standard of "suitable for procurement," it does not argue that the agency misinterpreted that statutory term in adopting the "appreciable value" standard in OAR 125-030-0015(5)(e)(A)(ii). Rather, petitioner appears to argue that the agency's factual findings do not show compliance with the "appreciable value" standard in the rule.

DAS adopted the following factual finding from the ALJ's proposed order:

"DAS and Garten provided reliable evidence that, although a skilled individual may be needed to set up the MLOCR, the actual running of the machine can [be] and is done by disabled individuals and has been done by such individuals for many years and that the transfer of the mail to and from the MLOCR is often performed by disabled employees."

We review a factual finding of an agency to determine if it is "supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). We are not authorized to reweigh the evidence or assess its degree of persuasiveness. ORS 183.482(7) ("[T]he court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion.").

Petitioner does not challenge the adopted finding as unsupported in the record. Nor does petitioner explain why that level of participation by disabled persons, together with the hand sorting services, is insufficient to add "appreciable value" to the mail sorting services. DAS did not err in concluding that "appreciable value" was added to the services by disabled persons under OAR 125-030-0015(5)(e)(A)(ii) so that the services were "suitable for procurement by public agencies" under ORS 279.845(2).

Petitioner's next assignment of error concerns the agency's implementation of ORS 279.845(1). That statute provided, in part:

"It shall be the duty of the Oregon Department of Administrative Services to:

"(a) Determine the price of all products manufactured and services offered for sale to the various public agencies by any qualified nonprofit agency for disabled individuals. The price shall recover for the workshops the cost of raw materials, labor, overhead, delivery costs and a margin held in reserve for inventory and equipment replacement[.]"

Petitioner claims that DAS erred in concluding that DAS "correctly determined the prices for Garten's mail presort

services pursuant to ORS 279.845(1)(a)." Petitioner argues that "it is clear that DAS allowed the provider to set the price" because DAS accepted the pricing proposed by Garten. Respondents counter that the plain meaning of the statutory obligation to "[d]etermine" means "to resolve authoritatively a question as to the proper price for services through investigation and examination of alternatives," which DAS did.

DAS found:

"14. After approval of Garten's request, DAS reviewed Garten's proposed prices for the mail presort services established pursuant to a Price Determination Workbook prepared by DAS. Garten had satisfactorily been providing mail presort services since 1984, and DAS assumed Garten would know best whether its suggested prices would allow it to recover its costs for raw materials, labor, overhead, and delivery costs, and give it a margin held in reserve for inventory and equipment replacement, as required by ORS 279.845(1)(a)."

(Citations omitted.) Based on that finding, DAS rejected as a "semantic" distinction the argument that DAS merely "agreed to" or "acquiesced" in the prices submitted by Garten and therefore did not "determine" the price. DAS concluded:

"Based on a plain reading of the text and context of ORS 279.845(1) as required by *PGE v.* [*Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993),] the law's purpose is the protection of QRFs to make sure they recover their costs. DAS reasonably relied on Garten's estimates of its costs and based its determination of the contract prices on such estimates. Perhaps this conclusion may have been different if the prices were much higher than market cost, which might affect the public interest, but the prices were reasonable. There are no legal grounds to set aside DAS's determination of the prices in the contract."

We conclude that DAS "determined" the price of the services offered by Garten as required by ORS 279.845(1)(a). The ordinary meaning of the word "determine" is:

"**1 a:** to fix conclusively or authoritatively ‹a council was set up to ~ national policy› **b:** to settle a question or controversy about : decide by judicial sentence ‹the court heard and *determined* the plea› **c:** to come to a decision concerning as

the result of investigation or reasoning ‹an attempt to ~ the date of his death› **d:** to settle or decide by choice of alternatives or possibilities ‹~ the list of guests to be invited›."

*Webster's Third New Int'l Dictionary* 616 (unabridged ed 2002). Thus, ORS 279.845(1)(a) requires DAS to resolve and fix the price of Garten's services in an amount that recovers Garten's costs and necessary reserves. That is what the agency did.

Although petitioner suggests that DAS's price determination was inadequate, it offers no suggestion as to what different foundation was required nor any legal authority for a requirement of a different price justification. We agree with respondents that ORS 279.845(1)(a) describes the duty of price determination in broad terms and that there is nothing in the plain language of the statute to suggest that DAS must negotiate price in any particular way. We affirm the conclusion that DAS lawfully determined the price of Garten's services as required by ORS 279.845(1)(a).

■ Finally, petitioner challenges the agency's finding that "Garten employed disabled individuals for not less than 75 percent of the work hours of direct labor required for the provision of services, as required by ORS 279.835(5)(c)." In the proceeding below, petitioner contended that the 75 percent requirement applied to the mail presorting services alone and not to the composite of services provided by all of Garten's employees. We rejected that construction of ORS 279.835(5)(c) in *Independent Contractors Research Institute.* There, we held that the 75 percent requirement in ORS 279.835(5)(c) applies generally to the QRF and not specifically to each particular product or service contract:

> "The text of ORS 279.835(5)(c) does not imply that only products or services deriving from a 75 percent disabled workforce can qualify for inclusion on the procurement list. The statutory criteria address providers, not products or services. An entity either qualifies as a QRF or it does not; the statutes do not provide for a partial qualification, that is, qualification with respect to some products and services and not others."

*Independent Contractors Research Institute*, 207 Or App at 91.[5]

On review, petitioner reiterates two arguments about compliance with the 75 percent standard. First, petitioner disagrees with the agency's acceptance of the results of an independent audit of Garten's operations that concluded that Garten met the 75 percent requirement. Petitioner contends that Garten should not have relied on disability determinations made by one of a number of sources, including physicians and governmental entities, where it could not be determined what qualifications were held by those attesting to "disability" or whether they knew the statutory standard. Petitioner argues that the testimony of its own expert witness was more credible. Second, petitioner claims that DAS should have excluded certain persons from the classification as Garten "employees" because Garten received outside funding to pay those persons.

In response, respondents argue that, by rule, a QRF is required to conduct an annual independent audit to confirm that it meets the statutory requirement, that Garten did so in accordance with DAS guidelines, and that the agency explicitly found the independent audit more credible than petitioner's proffered expert testimony. Respondents contend that a governmental or physician determination of disability is reliable and sufficient for purposes of the statutory requirement. Finally, respondents argue that petitioner's assertion that "program participants" cannot be "employed" within the meaning of the statute because Garten receives outside funding enabling it to pay for such employees lacks any merit. For the reasons that follow, we agree with respondents.

[5] Our reading of ORS 279.835(5)(c) is now reflected in the applicable administrative rule. Adopted in September 2003 and currently codified as OAR 125-055-0015(3)(d) (June 21, 2005), it provides, in part:

"To qualify under this subparagraph, an applicant is required, during the applicant's fiscal year, to employ Disabled Individuals for not less than 75 percent of the total work hours of direct labor required for the manufacture or provision of the products or services produced by the applicant. The 75 percent direct labor requirement need not be met with respect to each product or service provided by the applicant, or with respect to each contract the applicant enters into under this program."

■ We find no reason to disturb the agency's conclusion that those "program participant" employees who provide "direct labor" should be included in the calculation of what percentage of direct labor is provided by disabled individuals. ORS 279.835(5)(c) requires that the calculation be based on the number of employed individuals who provide direct labor. Petitioner does not explain why an individual's employment status would be affected by the source of the funds used by Garten to pay that person's wages. We likewise are not persuaded that a determination of disability by a governmental agency or a physician is not reliable evidence of disability. We reject those arguments by petitioner without further discussion.

Petitioner's remaining contention is that DAS should not have determined that Garten met the 75 percent requirement because Garten's audit results should have been disregarded in favor of petitioner's expert witness testimony. We review the evidentiary support for the agency's factual finding for substantial evidence in the record. As noted earlier, ORS 183.482(8)(c) provides that substantial evidence supports an evidentiary finding "when the record, viewed as a whole, would permit a reasonable person to make that finding." In this case, the certification by Garten's expert accounting firm and the report of its audit provide substantial evidence of the agency's factual finding of compliance with ORS 183.482(8)(c). Moreover, the agency's findings stating the reasons for its preference for those audit conclusions over the assertions of petitioner's expert provide substantial reason to support DAS's ultimate conclusion of compliance with the statutory standard. For an agency order to be supported by substantial reason, the agency must provide a rational explanation of how the facts found lead to the legal conclusions on which the order is based. *Drew v. PSRB*, 322 Or 491, 500-01, 909 P2d 1211 (1996).

OAR 125-030-0015(13) instructs that "[a]ll Agency Contracts with QRF's shall include a provision requiring a QRF whose total annual public agency contract value

---

[6] The reference in the rule to ORS 279.835(4)(c) is to the 75 percent requirement currently codified at ORS 279.835(5)(c).

exceeds $20,000 to conduct an audit of direct labor to determine compliance with ORS 279.835(4)(c)."[6] The audit is to be conducted as follows:

"(a) The audit shall be conducted by an independent Certified Public Accountant at the same time the QRF's annual financial audit is performed.

"(b) The independent Certified Public Accountant that conducted the annual audit shall sign an attestation that the QRF complied or did not comply with the requirements of ORS 279.835(4)(c) during the fiscal year period for which the annual financial audit was conducted.

"(c) The QRF must submit the direct labor audit attestation report, signed and dated by the independent Certified Public Accountant, to the Division."

*Id.* Failure to comply with the rule requirements and the direct labor requirements "may result in suspension or termination of the Contract with the Agency" and in "suspension or removal from the list of sources or potential sources of products and services[.]" OAR 125-030-0015(13)(d) and (e).

DAS found:

"Because it followed the strict Guidelines set up by DAS, the audit of Garten's accounting firm was reliable and is the type of evidence reasonably prudent persons would rely upon in the conduct of their serious affairs."

Weighing petitioner's evidence to the contrary, the agency determined:

"BWK's main rebuttal evidence was from its expert, Scott Stipe. Stipe reviewed parts of Garten's files for some of its disabled employees and testified that some of these employees were 'likely employable.' He then divided this number of 'likely employable' employees by the number of all the employees he reviewed and projected that a certain percentage of employees that Garten considered to be disabled were actually not. Such a projection was not proper because there is no evidence that the sample that he reviewed was a statistically valid random sample. His testimony did not rebut DAS and Garten's persuasive evidence for the following reasons[.]"

DAS went on to describe in detail its reasons for discounting petitioner's testimony and favoring the independent audit, eventually arriving at the conclusion that "[t]he evidence is unrebutted and establishes that Garten still met the 75 percent requirement during its fiscal year when the drivers' hours are included in the direct labor calculation." Respondents provided credible evidence that they followed DAS's guidelines in completing the required audit and that Garten met the 75 percent requirement.

Because there is substantial evidence in the record to support DAS's factual findings on the sufficiency of the independent audit and articulated reasons why DAS found that audit to be more persuasive than petitioner's proffered expert testimony, we affirm the agency's conclusion that Garten met the 75 percent requirement in ORS 279.835.

Affirmed.